This case presents two sets of issues requiring reversal. I'd like to focus on the first issue, which concerns a confrontation clause and Mr. Castro's right to confront the witnesses who made chain of custody statements with an evidentiary purpose. The chain of custody statements that the government introduced fall within the core class of testimonial statements, because under Crawford there are statements that declarants, quote, would reasonably expect to be used prosecutorially. The government on appeal has come up with some reasons why chain of custody statements might be used for non-prosecutorial purposes under other circumstances, but the record evidence here shows that the circumstances were intended to preserve and present evidence in a criminal case, and for that reason the statements meet the evidentiary purpose test. We know that for three reasons. First of all, the case agent below said that the chain of custody statements serve an evidentiary purpose. Excerpts of records 137 and 138, he repeatedly stated that it's the regular practice of Homeland Security investigations and drug enforcement agents to keep these records for the purpose of producing evidence in a criminal case. And secondly, the chain of custody— But you don't want the records. You want the people, right? Pardon me? You want the people, not the records. The declarant— The fact that they keep records is not one way or the other. You actually want everybody in the chain of custody to come in and say— The government— Am I understanding correctly? We're not saying that the government has to produce every declarant who was a link in the chain of custody, and that's not what Melinda's D.S. says, but having chosen or been told to produce links in the chain of custody, the government had to introduce that through live testimony, and that's again because— I'm sorry. How do you introduce it through live testimony? Let's say there are four people in the chain, and you need a recipient witness as to each link. How would you be able to do that with any less than, let's say, three people, at least? If the government elected to produce three links in the chain, then what gaps remain? Well, let's say there are four links in the chain, and you might have sort of the last person say, you know, I got it from X, and then I had it, you know, so you might be able to skip one person. Maybe you could skip one person at the other end, but otherwise you'd have to have everybody in the chain, right? You would— I'm just asking a practical question. I'm not challenging you. I'm just trying to understand your position. I understand. So in this case, it would have been perfectly fine if the government had elected to put on link one through the testimony of that declarant, who was link one, and link eight, who was the declarant at link eight, and link 13, for example. And then what gaps remained there, that would go to the weight of the evidence. Well, how do you come up with one, eight, and 13? Because that's what happened here. They had the seizing agent, who was link one, then the chemist, who was link eight. But then what they did was they had—they called the case agent— Hold on, hold on. I'm not sure if my colleagues are as confused as I am about what you're saying right now. I'm more confused. Are we talking about—aren't you talking about once they chose to reopen? Yes. Okay, pick up there, because that would be very helpful. Because the judge indicated that there was some trouble with the chain of custody, and the government reopened and did what? What they did upon reopening was they called the case agent. The case agent got up— Who was not there at the time of the seizure. He was not there at the time of the seizure. He was not there at the time the drugs were moved from the point of seizure to the vault to any other— Is he anywhere in the chain? He was links 11 and 14. So what happened was the case agent got up, he sat in the witness box, he looked at these chain of custody forms, and he literally read out the signed statements of the government agents at links 2, 3, 4, 5, 6, 7, 9, 10, 12, 13, and 15. He read these other declarant statements into the record. That's surrogate testimony of statements that were designed for a prosecutorial purpose. Okay, so you've already acknowledged that the government doesn't have to bring in—we'll just make a hypothetical 10-link chain—they don't have to bring in everybody. Right. But your position is because they chose to introduce this on reopening, the one witness, that they had to do what? Because they chose to present evidence of all of these interceding links by reading the signed statements, they had to produce the signers of those statements. So that's everybody? That's everybody in this case. They could have said, okay, we're just going to read a handful of those links, but then they would have had to produce the declarants who signed those statements. Are you still more confused? Yeah, I guess I'm confused. Can they present a case and show no links? I mean, in that case, you'd move for a directed verdict, right, or a verdict of acquittal, because they haven't— Okay, 14, 15, how many links are there? There were 15 links. How many witnesses did they have to produce? The witnesses that they did produce? No, how many were they required to produce? There's no rule as to how many they are required to produce. How about one? If they had produced one, then they would have produced one, and defense counsel below would have argued that that was insufficient, and the government— I don't care what he would have argued. What would the law have been? The law would have been that, I mean, at that point, we would have made the Rule 29 and argued that there was insufficient evidence. I don't care what you would have argued. Tell me what the law was. How many would they have had to produce? There's no law that says they have to produce a certain number, and I think the passage in Melendez— So what would you have done? They came up with one witness for the 14 links. We would have made the Rule 29. Yes, and what would your position on the law have been? Our position on the law would have been that they had failed to establish sufficient chain of custody, and the evidence didn't—the evidence wasn't sufficient to convict. So your position is that in order to put in a complete case that's proof to a Rule 29 motion, they have to bring in the 14? Yes. All 14? Not necessarily all 14. That's where we're having a little difficulty. You're all stumbling over. I think that the— How did they get away with less than 14 and still prevent a successful Rule 29 motion? The more links that they could prove, the stronger the chain of custody would have been. So, yes, if they had—yes, if they—the strongest case they could have presented would have been all 14. The way a chain works, you only need one weak link, one missing link, and then it's not a chain at all. So I'm not sure what you mean by that. Well, you know, the strong—the more people they bring in. Unless they bring in a complete chain, then you would argue that's insufficient evidence, right? And you would win. Yes. So let me ask the question one more time. In order to make a case that's proof to a Rule 29 motion, they'd have to bring in all 14, right? To present the—yes. Okay. And— That only took, like, you know, dentistry, you know, pulling teeth to get out of it. I'm sorry. But that's what you mean, right? If they want to put on a case, they have to bring everybody in the chain in. Ideally, they would present every link. That's what she means at this point. Oh. And then those links would have to be produced through the live testimony of the government agents. Essentially, what this comes down to under the primary purpose test is that when a law enforcement agent makes a statement that's generated in the course of producing evidence in an ongoing criminal investigation, that statement is a testimonial statement. It has to be introduced through the live testimony. Do you want to say anything about the reopening? Yes. The reopening here was improper and requires reversal as well. The district court— Don't district judges have broad discretion? —to grant a government's motion to reopen their case in chief when the government was surprised by— Either sides, right? It could happen to the defense, too. Right. Or the other side. But here, nobody moved for—the government didn't move for reopening. In fact, they argued against reopening. The district court directed them to reopen after— District judges are notoriously independent. Yes. And they have powers to make sure that the trial—I mean, very broad powers to make sure that the trial happens in an orderly fashion. And if the district judge here on his own motion decides to reopen, what's the beef? I mean, you hadn't put on any—the defense hadn't put on any evidence, so it's not like you were boomeranged or something. Right. I see that I'm out of time. Can I— You better answer. Okay. So— You're not going to get away so easy. It's not moot court, you know. So what happened was the district judge here said, well, yes, I'm troubled by the absence of chain of custody evidence. I don't think that the government—I think you did a terrible job putting on chain of custody. And the government disagreed and said, no, we think it was fine. And the judge then went through all of the evidence, including as it existed prior to reopening, including discrepancies in the weight amounts of the packages seized compared with the drugs tested, the volume of seizures which came out through the government expert witness. Right. We know that. This is just a description of what happened. We do know that. So having looked at all that evidence, Judge Burns here said, I don't know. I think a jury could find that the government hasn't met their burden. Counsel, to be fair—forgive me for interrupting, but to be fair, Judge Burns also said pretty clearly, I worried about this last night. I think I made an incorrect—I think I made a mistake yesterday and the government relied on it. And if I had sustained the objection, the government surely would have cured. So what was—what's the harm in him trying to fix his mistake? Otherwise, he's prejudiced the government's case. Well, first of all, he didn't make a mistake. He did sustain the objection. If I disagree with you about that, then what's your answer? The harm here is that the judge recognized that there was an argument that a jury could find that the drugs weren't linked to our client. And he sought to—having recognized that there was a possibility of acquittal, he told the government to reopen their case. That's improper. The government didn't want to reopen their case. They didn't move to reopen their case. This is not the type of extreme reluctance with which a judge is supposed to— So is this an argument of misconduct, judicial misconduct? Is that what you're— Yes, we believe the judge acted improperly in this case. He did mention the case law and cite the standard about extreme reluctance. He was aware that he was supposed to be extremely reluctant, right? He did recite the extreme reluctance rule, but he misapplied and misidentified the standard for when reopening is appropriate based on whether the government was on notice of the omitted evidence. The court said, well, you know, they were on notice here, and therefore reopening is okay. But the standard is that when the government is on notice and elects not to present that omitted evidence, that reopening is disfavored. That under those circumstances, a judge should be extremely reluctant to reopen. In your analysis, the fact that the judge woke up the next morning and thought he'd made a mistake and that the government relied on his ruling to its detriment, that doesn't play a part in this analysis? Not on this record, where it's very clear from the record that what the judge said was that the chemist can't testify to other people's links in the chain of custody, alerting the government to the fact that they would either have to fill those links or rest knowing that they were comfortably without them. Thank you. Had you made a Rule 29 motion at that point? Yes. And was it based on this? Yes. Okay. Thank you. Good morning, Your Honors. May it please the Court, Emily Kiefer for the United States. The conviction here should be affirmed because both reopening was proper and the documents admitted after reopening were properly admitted into evidence. The district court here, as Your Honor noted, quoted this court's precedent verbatim from Hernandez-Meza and engaged with the parties at length. Could you speak up a little, please? Certainly, Your Honor. The district court here quoted this court's precedent about the appropriate legal standard that applies in reopening cases verbatim and addressed a variety of factors relevant to that consideration with the parties here, concluding that a variety of facts supported his decision to allow the government to reopen here. The documents that were admitted after reopening were properly admitted. And I would emphasize for Your Honors that in his reply brief, the defendant has narrowed the issues for this court's consideration. So the defendant does not contend that any statements from McPeel, Medrano, or Tarrin Brousseau implicate the Confrontation Clause. So at this point, what the court is left with is the evidence prior to reopening, which is that packages were concealed inside the defendant. I'm not sure that I agree with what you just said. I think she's definitely. Let's just talk about the first link, which I think is pretty squarely raised. The person who testified on, forgive me, the name of the seizure agent? Yes, Officer McPeel. McPeel, thank you. So that person testified on day one, I think, about what he did, and there's all kinds of photos of the stuff in the back of the truck and whatnot, the contraband that was seized. But he doesn't really testify about what he did with it, right? And then on day two, there's this exchange we just discussed where the judge thought he made a mistake and allowed the reopening, in fact, insisted upon it. And McPeel wasn't there. So a different – the case agent then testified, and I heard opposing counsel argue that that's a problem because he went through each of the – I guess there's 15 links. I had not counted them. But even – let's just talk about the first one. Is that not testimonial, the little stickers or whatever it is to indicate that those – that that contraband went from Officer McPeel to, you know, link number two? No, Your Honor. Those notations are not testimonial for two reasons. First, Officer McPeel, as the seizing officer, had an obligation independent of whether this case was ever criminally prosecuted. That would have been really good evidence for the government to introduce. I understand the argument that the DEA or the government has to keep track of controlled substances just like a bar code, just like FedEx keeps track of a package, whether they're going to prosecute somebody or not. And I looked hard for that evidence in this record, and it's very skinny. But I think I've reviewed it thoroughly. But in this particular case, when we talk about whether or not that sticker was testimonial, counsel, it's pretty tough to argue that the government wasn't intending to prosecute this individual, right? Maybe in a different hypothetical, but this person was seized at the border with his drugs. In fact, he was literally sitting on them, right? I understand. I understand. And I think that this case, then, is analogous to United States v. Morales, where the forms in that situation are forms that Border Patrol agents fill out when they encounter illegal aliens in the field. And sometimes those encounters result in criminal prosecution. Sometimes they do not. Right. In this instance. But whether they do or not, they fill out the form, is your point? Yes. Exactly. And that's the same when drug seizures occur at the border. A form gets filled out regardless. You know, the problem is that's what I know to be true from other cases. Where is that in this record? Where did the witness explain that? Agent Medrano explained that they are under a legal obligation. That's what he said. So where's the test? Do you have any other ER site for me? Because he doesn't explain that we do this whether there's going to be a prosecution or not, which I think is the critical point, isn't it? I understand Your Honor's point. I think that Agent Medrano at various points talks about how they're under a legal obligation to keep these records. I don't think he ever says regardless of whether the case goes to criminal prosecution or not. But the fact is that these are forms kept regardless of whether the case actually is criminally prosecuted. And on top of that, if you look at the stickers which are attached to the boxes themselves, and these are boxes that were admitted in the United States case in chief prior to reopening, the stickers on the boxes themselves are not the sort of attestations, affidavits, that are the formal sorts of statements the Confrontation Clause was intended to foreclose. These are initials by the DEA chemist, Taryn Brousseau. They're just the name of the officer who did the seizure, the date of the seizure. These are not the sort of affidavit-like statements that the Confrontation Clause was meant to address. Okay, if you could hang on. If you could just give me one second. I have these, and I want to make sure that I'm understanding you correctly. Because there's the stickers that are truly stickers. We're not talking now about the DEA 7 or the custody affidavit. That's correct, Your Honor. Then there's another rectangular sticker that's on the boxes. Yes. So Exhibit 10. Oh, wait a minute. That's a photo of the methamphetamine. Excerpts of Record 216 through 218, those are the photographs of the actual stickers on the boxes themselves. Okay, I've got those. Yes. And DEA chemist Taryn Brousseau, when she was testifying, was giving live testimony about these stickers, about her initials, about the dates. She was indicating that these initials, these dates, were what she did to keep the chain of custody. There was an extensive colloquy both between the United States and Taryn Brousseau and between the court and Taryn Brousseau about these writings, and then the United States offered the boxes themselves into evidence. And it's these stickers on the boxes themselves which show the drugs were sealed by the time they got to Taryn Brousseau. They were seized by one. I'm sorry. They were seized by Officer Nack Peel from Juan Castro on April 13. Can I ask you this? They're seized. They're identified. And they're shipped off somewhere to a chain of custody. You don't know at the time whether they will be used in the prosecution, but they might or might not be used in prosecution. Yes, Your Honor. And the other thing you might do with them is what? Seize them and forfeit them or just keep them or destroy them? Exactly, Your Honor. And to ensure that all of the drugs are destroyed and none of them make their way into the public domain, it's necessary to track when, to track the amount and make sure. But you don't know when you identify them and ship them off, whether it's for a criminal trial or to be destroyed. It could be either one. Yes, Your Honor, that's correct. At some point you do. Yes. I mean somewhere in the chain of custody somebody decides, hey, this case is going to prosecution, so we're going to now route it to a USA, I don't know, or to the local DA office. I don't know how these things are stored, but at some point a decision is made, this is going to prosecution. So how do you deal with that part of the chain of custody after a prosecutorial decision is made? So temporally, on the date of seizure, Officer Nack Peel is the seizing officer, and at that point it's not clear whether this case is going to be prosecuted criminally. When I look at that pile of drugs, I'm thinking to myself, boy, that looks like a prosecution to me. I understand. I mean, just... It's a lot of methamphetamine in the bed of the truck, right? So it's a pretty good clue. But okay, I'll... Yes. As a theoretical matter, it might not be.  Okay. So the seizing officer takes the drugs on the date of seizure. There's notations on the box from the seizing officer. The testing officer then talks about her part in the chain of custody. She introduces photos from the date of testing. Now, excuse me, just so I understand. When the testing officer gets a doctor, she gets the whole load? Yes. So if it is 17 tons of marijuana, it all gets hauled to the lab? I realize that's not what's going on here, but 17 tons of marijuana is not that unusual, right, in your district? I don't know the answer to that question. So I'm... Okay. I don't know the answer to that particular question. But in this case... In this case, they all went to the... But it didn't go from Napsol to the testing officer, if you mean the chemist. It went to... What about Mabel? I don't remember her last name. But it went to several people before it got to the chemist, right? Yes, Your Honor. So in the government's case in chief, the evidence that was admitted was stickers from NACPEL from the date of seizure, then Taryn Brousseau talking about receiving boxes that had NACPEL's notations on them, and then Taryn Brousseau... At the lab. At the lab, exactly. So to the extent there are missing parts of the chain, they're not implicated by the Confrontation Clause because the United States, as the defense noted, has the option of presenting those parts of the chain that it thinks are crucial. And that's what the United States did. Which parts are crucial in this case, counsel? In this case, the parts that are... Well, let me back up. I think there are a couple of ways to show the drug's identity here. One is chain of custody. Another is the distinctive nature of the packaging itself. So which one are you relying on? So we have both, actually, in this case. Which one are you relying on? Both? Yes. So in this instance, there's the notations from NACPEL on the date of seizure going to Taryn Brousseau on the date of testing. She testified... And those are both crucial? Those implicate the Confrontation Clause? I'm trying to get you to identify which links you think are important. Okay. In this case, I don't believe that chain of custody evidence was necessary to identify these drugs as the drugs that were seized from the defendant. So you're not relying on that? You're not relying on the photos? I think that the photo evidence is sufficient by itself, without chain of custody, to identify these drugs as those that were seized. So it's really just a yes or no? Are you relying on the photos? We're back to dental work. Are you relying on the photos? Yes, we are relying on the photos. Okay. So I thought about that, too, and I looked through them because they have this very unique marking, Big Bird, which doesn't... Those photos at the border are quite distinctive, the wrapping and whatnot and the marking. But I can't see all of those in the photos at the lab, can I? I believe that you can. Exhibits 23 and 24 were the exhibits that Taryn Brousseau admitted, and they show the full close-up of each package. Oh, maybe I said it backwards. So 23 and 24, I see it very clearly, and those were taken at the lab? Yes. Okay. So can you show me the corresponding photos at the border? Yes. The corresponding photos at the border are in Exhibits 10 and 11, I believe. Okay. So those photos... Are those in the ER? 10 and 13, my apologies. Are those in the ER? Yes, they are. SCR 46, I believe. Is that right? And ER 214? The duct tape seems to obscure the writing a little bit. What's the best one you want me to look at to see that writing? Exhibits 10 and 13 are SCR 46 and 47. Those are the photos that match up with the drugs that Taryn Brousseau tested. Okay. And to be clear, Your Honor, I think what we essentially did at trial was a hybrid of the distinctive nature of the packages combined with the chain of custody testimony. So basically, there's drug boxes that were sealed at the time they got to Taryn Brousseau that have Officer Nak-Peel's notations on them. Two, right? Correct, two boxes. And those boxes contained distinct packages, photos of which, from the date of seizure, match photos from the date of testing. And then at trial, Taryn Brousseau... Can I interrupt you right there? Sure. And then the custody form, which I don't have in front of me, but then it becomes three boxes. And I think she testified she couldn't put it all back in. It's like repacking a suitcase. So she put it in three boxes. That's correct. Okay, so that explains why we get them three boxes. Yes. Okay, and you were saying at trial what? Yes, and at trial, Taryn Brousseau testifies that these drugs are the same drugs that I tested. So the link between... And the judge asked her, how do you know that? Yes. And in part, her answer was based on the notations on the outside of the box, the stickers. Okay, so forgive me, but there's two stickers on the outside of these boxes, the big one or the little one? I think one indicates it's resealed. Which page are we looking at? Now we're looking at ER 216. I am, anyway. I can get there. Oh, wait, sorry, ER 218. There's a big sticker and a little sticker. And which one was put on by whom, please? So Taryn Brousseau admitted the boxes as a whole, and she talked about how the stickers and labels on the boxes let her know that these were the same drugs that she tested in the lab. And on top of the photos and the partial chain of custody evidence that was put in in the United States case in chief, the fact is that the way that these packages were concealed in the defendant's vehicle, the way that they were put in the seat, suggests that there's contraband. These were not packets of sugar that the defendant was bringing across. But how does that help us? Once they're removed from the truck, I'm not following how that helps us. I'm trying to say that even outside the particular drug evidence that was introduced here, there was evidence at trial to show that the defendant had methamphetamine, and that consisted of the way that these packages were concealed, the fact that a drug dog, a trained canine, alerted to the packages. The problem is we've got to make sure it's the same stuff. Could there have been some other illegal drug that's ‑‑ I don't know. These were white. I can't quite tell. Your Honor. These were white? There was a white substance inside the packages. And this was meth? Yes. Could it have been heroin? I'm sorry? Could it have been heroin? Not based on the evidence that was admitted in the United States case in chief. So in the United States case in chief, the defense on cross‑examination of officers who were on the scene that day confirmed not only that there were drugs found by those officers, but confirmed also that methamphetamine was found. This is at ER 39. But you can't tell from the look. You have to have the testing. And I grant you, this is not sugar, this is not flour. People don't transport illegal substances in the seat of a car. But you do need the testing to tell you this is methamphetamine as opposed to heroin. I don't know. I think Mexican heroin is brown. There are other illegal substances that are white that it could be, right? So to tell you this is, in fact, methamphetamine as opposed to some other illegal white substance, you do need the testing. So you do need the drugs in the lab to identify this. The testing certainly helps here. What I want to emphasize is that at ER 39, in cross‑examining the seizing officer, defense counsel actually confirmed with the seizing officer that he wrote his report after finding methamphetamine in the vehicle. How does he know? Well, it was not brought out at trial, but this particular officer did conduct a field test, and the defense in their own cross‑examination confirmed with the officer that he found methamphetamine in the vehicle, that he wrote his report after finding the methamphetamine in the vehicle. So he testified. He doesn't say he conducted a field test, but he does testify that it was methamphetamine. It was the defense's question at ER 39. And is the answer to Judge Kaczynski's question yes? Yes, Your Honor. Effectively, the seizing officer is asked, did you write your report after finding the methamphetamine? And he says yes. And so there's a confirmation, even by defense in cross‑examination of the seizing officer, that this substance was not just drugs but methamphetamine. So I gather the sum of substance of what you're saying here is you're still disagreeing with the district judge that you needed the chain of custody. Yes, Your Honor. Your view was that this was marked with a unique sticker. Yes. And that sticker then shows up at trial. Yes. And it doesn't matter what happened to the thing in between because you've ‑‑ so if you put a barcode on it, it's like the FedEx package that Judge Kristin mentioned, right? Yes, Your Honor. And as to the integrity of the drugs in the interim between seizure and the date of trial and the date of testing, the photos from the date of testing show the packages intact, that the wrappings have not been removed. As Judge Kristin noted, the removal of the wrappings was what required the introduction of a third box here. So there was sufficient ‑‑ I guess I would analogize it to belt and suspenders. The United States position is that what was admitted ‑‑ But you didn't think you needed suspenders. You thought you had a pretty good belt, right? Yes, Your Honor. But the district judge insisted, so you said, okay, in that case, we'll put it in. Exactly. So there was belt and suspenders proof here that the drugs admitted at trial were, in fact, seized from the defendant. And because of that, largely, there's no prejudice to this defendant. Effectively, what occurred was there was more evidence in the United States' view to support the foundation for these drugs than was legally required. And there was enough prior to reopening and after reopening, there was no error in the admission of the extra documents. Thank you, counsel. Thank you, Your Honor. Do you have a brief rebuttal? You don't need to, but you have. Well, if I could just ‑‑ Yes. Just a quick point, Your Honors, with regard to the photographs. There are significant discrepancies between the photographs that the seizing agent took and the photographs that the chemist took. For example, if you look at ER 214, the photo that the seizing agent took of the taped together long string of bricks in the bed of the truck, some of those bricks appear to have some markings on them. Some do not. But if you look at ER 220, the photograph taken by the chemist, up at the top there, she indicates that all 20 packages had markings. Seven were marked with Puerco, and the remaining 13 were marked with Pajaro. So it's clear that all of the packages that the seizing agent looked at had markings, but all of the packages that appear in the ‑‑ I'm sorry, that the chemist looked at had markings. But if you look at the photographs taken by the seizing agent, not all of those have markings. Is that because the duct tape covers, or we can't tell what's under the duct tape? Is that the ‑‑ No. If you look at ER 214, even where the duct tape appears, you can see some markings above the duct tape, but then on other bricks you can't see anything at all. And one other discrepancy that I would point to, which is that ‑‑ They could be on the underside, right? I don't know. They're not here. They're not here, and the seizing agent, or the chemist, says that they're on every single brick. I think the Pajaro was not something that was there when they were found. This was not something put on there by the agents. The word Pajaro. Right. These are the photographs that the seizing agent took at the time. But the other remarkable thing here is that the duct tape adheres all of these bricks together over this, some type of plastic covering. But in the chemist's photographs where the duct tape is removed, you don't see any kind of disruption of the packaging, any kind of damage that you would expect to be caused by tape removal. So there are significant discrepancies here, and for that reason, we don't believe that any ‑‑ that the error can be said to be harmless beyond any reasonable doubt. There were discrepancies in the record. There were weight discrepancies. There were differences between the photographs. And because these statements were clearly made when there was an ongoing criminal investigation, before that investigation had been resolved and were made by law enforcement agents, their primary purpose was an evidentiary one, which is testimonial. If there are no further questions. Thank you, Captain. The case to surrogate will be submitted.
judges: Reinhardt, Kozinski, Christen